```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2

 3    ------------------------------------X
                                         :
 4    MARSHALL, JR., et al.,             :   19-CV-04741 (RRM)
                                         :
 5                    Plaintiffs,        :
                                         :
 6              v.                       :   225 Cadman Plaza East
                                         :   Brooklyn, New York
 7    MARINE BULKHEADING, INC., et al.,  :
                                         :   December 17, 2019
 8                    Defendants.        :
      ------------------------------------X
 9

10

11            TRANSCRIPT OF CIVIL CAUSE FOR INITIAL CONFERENCE
                 BEFORE THE HONORABLE JAMES ORENSTEIN
12                  UNITED STATES MAGISTRATE JUDGE

13    APPEARANCES:

14    For the Plaintiffs:        TANA MARIE FORRESTER, ESQ.
                                 Shulman Kessler
15                               534 Broadhollow Road
                                 Suite #275
16                               Melville, New York 11747

17    For the Defendants:        JOHN N. CUOMO, ESQ.
                                 11 Fern Drive
18                               Commack, New York 11725

19                               STEPHEN VINCENT BARBARO, ESQ.
                                 Alter & Barbaro
20                               26 Court Street
                                 Brooklyn, New York 11242
21
      Court Transcriber:         RUTH ANN HAGER, C.E.T.**D-641
22                               TypeWrite Word Processing Service
                                 211 North Milton Road
23                               Saratoga Springs, New York 12866

24

25


      Proceedings recorded by electronic sound recording, transcript
      produced by transcription service.
```

2

1    (Proceedings began at 11:06 a.m.)

2         THE CLERK:  Civil cause for initial conference,

3    Marshall, Jr., et al. v. Marine Bulkheading, Inc., *et al.*,

4    docket number 19-CV-04741.

5         Would you all please state your appearances for the

6    record starting with the plaintiffs?

7         MS. FORRESTER:  Tana Forrester from Shulman Kessler

8    for the plaintiff.

9         THE COURT:  Good morning.

10        MR. BARBARO:  Stephen Barbaro from Alter & Barbaro,

11   26 Court Street, Brooklyn, New York for the defendants.

12        THE COURT:  Good morning.

13        MR. BARBARO:  Morning.

14        MR. CUOMO:  John Cuomo, 11 Fern Drive, Commack, New

15   York for all defendants, co-counsel, along with Alter &

16   Barbaro.

17        THE COURT:  Good morning.

18        MR. CUOMO:  Morning.

19        THE COURT:  All right, folks.

20        So Ms. Forrester, I've read the complaint.  It goes

21   into some detail.  What, if anything, should I know to get up

22   to speed beyond what's in the complaint?

23        MS. FORRESTER:  There's one thing to get up to speed

24   with and that's if we are going to engage in -- in substantial

25   settlement discussions, we need payroll documents.

3

1      THE COURT:  Okay.  Well, I'll get to discovery and
2  settlement later, but just in terms in factually you've laid
3  out in detailed the cause of action.  What are your clients
4  doing now?  Tell me about the damages you claim they've
5  suffered.
6      MS. FORRESTER:  So two of my clients are fully
7  employed right now and they are making more money than they
8  were.
9      THE COURT:  Okay.
10     MS. FORRESTER:  There were periods of unemployment
11 for all of the clients.  One client has not been reemployed
12 since he was terminated and one client was employed, lost that
13 employment, was laid off because business was slow and has
14 not --
15     THE COURT:  I take it the new employment would cut
16 off any damages after that point.  In other words, if he got a
17 new job and then lost that job you can't attribute the loss of
18 the income at that point to the plain -- to the defendants,
19 right?
20     MS. FORRESTER:  Well, it was our position that
21 the -- that the front pay still exists, even though he got a
22 new job.
23     THE COURT:  Um-hum.
24     MS. FORRESTER:  Once he then becomes unemployed that
25 he still has front paid damages because he if not for the

4

1   discrimination and retaliatory actions of the --

2          THE COURT:  All right.  I understand the theory.

3   I'm not going to rule on it.  I just want to know.

4          So what do you say the economic damages are?

5          MS. FORRESTER:  So for each plaintiff the economic

6   damages are slightly different because of their employment.

7          THE COURT:  Yeah, but ballpark.

8          MS. FORRESTER:  And that they all are planning on

9   undergoing treatment, although they have not --

10         THE COURT:  Okay.  That was going to be my next

11  question.

12         MS. FORRESTER:  Okay.  So would you like me to lay

13  out for you --

14         THE COURT:  Ballpark.

15         MS. FORRESTER:  Ballpark.

16         THE COURT:  Yeah.

17         MS. FORRESTER:  All right.  So for John Williams

18  it's approximately $203,500; for Marshall, Jr., it's $190,000;

19  for Marshall III, 100 -- sorry -- that would be $190,000.  For

20  Marshall III it's $170,000 and for Rayjay James it's $210,000.

21         THE COURT:  Okay.  So ballpark around 200 for each?

22         MS. FORRESTER:  Yes.

23         THE COURT:  Okay.  And what had there annual income

24  been when they were working?

25         MS. FORRESTER:  Each one had a slight -- slightly

5

1    different income.

2              THE COURT:  Again, ballpark.

3              MS. FORRESTER:  Approximate -- all right.  So for

4    John Williams it was approximately -- when I averaged the

5    years that he worked --

6              THE COURT:  Yeah.

7              MS. FORRESTER:  -- $45,000 per year.  For Marshall,

8    Jr., it was $40,000.

9              THE COURT:  Okay.  Again, I'm just trying to get an

10   order of magnitude.

11             MS. FORRESTER:  Okay.

12             THE COURT:  All around the same order of magnitude?

13             MS. FORRESTER:  Marshall III actually made less than

14   the others.

15             THE COURT:  Okay.

16             MS. FORRESTER:  So he was making approximately 31.

17             THE COURT:  And when were they terminated?

18             MS. FORRESTER:  So for Williams, Marshall, Jr., and

19   James they were terminated in approximately April 2019 and

20   Marshall III it's earlier than that.  I believe it's December.

21             THE COURT:  Okay.  All right.  So the bulk -- it

22   sounds like the bulk of the economic damages are based on

23   front pay.

24             MS. FORRESTER:  Front pay and emotional damages.

25             THE COURT:  Well, the numbers you gave me, around

6

1  200K per --

2          MS. FORRESTER:  Yeah.

3          THE COURT:  -- plaintiff, I was asking about

4  economic damages.  Were you figuring in --

5          MS. FORRESTER:  Oh, I was including all in at the

6  settle -- at -- except for the differential pay number.

7          THE COURT:  Okay.  All right.  And to the extent

8  they get treatment I assume you're going to provide releases

9  for records, yes?

10          MS. FORRESTER:  Yes.

11          THE COURT:  Okay.  All right.  And, oh, a couple

12  other things.  What, if anything, were they told was the

13  reason for the terminations?

14          MS. FORRESTER:  For Marshall, Jr., it was because he

15  was refusing to leave a car, so insubordination.

16          THE COURT:  Um-hum.

17          MS. FORRESTER:  For John Williams it was because he

18  refused to take a urine test.

19          THE COURT:  Um-hum.

20          MS. FORRESTER:  For --

21          THE COURT:  And had he refused?

22          MS. FORRESTER:  What?

23          THE COURT:  Had he refused?

24          MS. FORRESTER:  He had refused; however, it was --

25  there was an unemployment case about this and it was decided

1    that this -- this urine test situation came up after he had

2    both been injured on the job and also had complained about

3    the --

4              THE COURT:  I just want to get a sense of --

5              MS. FORRESTER:  -- racial discrimination.

6              THE COURT:  -- where the factual issues are.  Go

7    ahead.  You had -- you were going to tell me about the others.

8              MS. FORRESTER:  And Mr. James, I think he was just

9    told it wasn't working out.

10             THE COURT:  Okay.  In any of this in documents or

11   orally?

12             MS. FORRESTER:  Oh, it's all -- it's all orally.

13             THE COURT:  Okay.  You also in your amended

14   complaint refer to a threat of litigation that came from

15   opposing counsel.  You quote partially from it.  You haven't

16   given me the letter.  You don't need to do that, but I'm just

17   curious.  Does it cite any basis for a lawsuit other than

18   allegations made in the complaint in this case?

19             MS. FORRESTER:  No.

20             THE COURT:  Okay.  All right.  And from your

21   perspective any discovery issues I'll need to take up?

22             MS. FORRESTER:  Well, we haven't come to an

23   agreement about ESI yet.  We've discussed it but we still need

24   to, you know, go back and forth with edits over that

25   agreement.

8

1          THE COURT:  Okay.

2          MS. FORRESTER:  And we have talked about it.  It

3   seems like it, that they're going to provide everything that

4   I'm asking for with the payroll documentation, but I don't --

5          THE COURT:  There are no disputes that you're aware

6   of?

7          MS. FORRESTER:  Yeah.

8          THE COURT:  Okay.

9          MS. FORRESTER:  And the only issue would be if we

10  wanted to, you know, do mediation or enter into settlement

11  discussions before discovery got started.  There are some

12  limited discovery that we would need.

13         THE COURT:  All right.  Mr. Cuomo and Mr. Barbaro, I

14  don't know who wants to speak.  You're both welcome to.

15         First of all, I'm just curious.  You're representing

16  all the defendants and the complaint not only attributes

17  racial slurs to one of them, but attributes to another -- or I

18  think a couple of others -- apologies for those racial slurs

19  and statements about, you know, what would be done about them.

20  So what can you tell me about potential conflicts among your

21  clients about what to admit, what not to admit, litigation

22  strategies because there seems like there's at least a

23  potential conflict there.

24         MR. BARBARO:  Well, at this stage -- and this is why

25  we have two counsel --

1          THE COURT:  Well, but you're both representing all

2   the defendants, so --

3          MR. BARBARO:  I know, but you might end up --

4          THE COURT:  -- there -- so that doesn't do anything

5   to alleviate the conflict issue.

6          MR. BARBARO:  I know.  We might end up splitting our

7   duties in terms of this thing.

8          THE COURT:  No, you certainly -- look, if there's a

9   conflict --

10          MR. BARBARO:  Yeah.

11          THE COURT:  -- you won't resolve it by having one of

12   you represent some and some -- and one represent the others

13   because right now --

14          MR. BARBARO:  Yeah.

15          THE COURT:  -- you're representing all.  So maybe

16   that there's some -- some or all potentially defendants that

17   you can't represent but you can't just divide them up between,

18   that wouldn't resolve anything.  But tell me about how

19   ethically you are -- I'm not challenging your efforts but --

20   because I'm sure you have done what you need to do looking

21   into the issue and giving your clients a full explanation of

22   it and getting informed consent, so I just want you to tell me

23   what you've done and how you've resolved it to date.

24          MR. BARBARO:  Well, we have -- in terms of our

25   investigation we have not discovered anything that we would

1   think is a conflict of interest.  I know what --

2          THE COURT:  Well, if --

3          MR. BARBARO:  Counsel is saying something different,

4   but in terms of our position --

5          THE COURT:  Okay.  Well, just factually.  I mean,

6   did Mr. Anselmo make these racial slurs?

7          MR. BARBARO:  I do not believe -- right now it's his

8   position he did not.

9          THE COURT:  And so -- I forget the name of the other

10  fellows to whom complaints were made who said this shouldn't

11  happen.  What do they say about those comments?

12         MR. BARBARO:  Do you want to -- that's one of the

13  other -- DeSousa's.

14         MR. CUOMO:  I believe you're referring to Michael

15  DeSousa in that and as far as what we've gone through there's

16  just been a general denial by all of the defendants.

17         THE COURT:  I know there's a general denial, but I

18  want to know affirmatively what they say happened.  They never

19  had these conversations or it didn't go as -- in the way the

20  plaintiff -- the plaintiffs allege, what?

21         MR. CUOMO:  My understanding is that the

22  conversations as alleged never occurred.  That's what I

23  understand and --

24         THE COURT:  As alleged meaning it didn't happen at

25  all or it happened in a different way?  I'm really not trying

1  to get a legal position so much as a conversation with you

2  since you know facts and I don't about what your clients say

3  did happen.

4            MR. CUOMO:  Right.  And what I'm trying to relay to

5  the Court is upon taking the case in and upon looking at the

6  circumstances, the exact same issues and alarm bells went off.

7  We went through and had generalized conversations related to

8  the complaint and --

9            THE COURT:  Well, I'm grateful to hear about

10  generalized, but I know that you can't possibly have submitted

11  an answer that responds to allegations about specific -- no

12  statements without having specific conversations with your

13  client.

14            MR. CUOMO:  Well, what I'm trying to relay is, at

15  first we went through and had generalized conversations

16  related to the complaint and then we went back and addressed

17  each individual item within the complaint as to each

18  individual defendant.  And each one of them has denied that

19  the -- in terms of Mr. DeSousa denied the conversation

20  occurred.

21            THE COURT:  So they never came to him and complained

22  about it to someone anyway.

23            MR. CUOMO:  As far as I know and as far as my

24  compensation went with Mr. DeSousa, this conversation did not

25  occur.

12

1          Now, as to --

2          THE COURT:  At all.  In other words, there was no

3   complaint about Mr. Anselmo?

4          MR. CUOMO:  My concern when --

5          THE COURT:  Would you please -- look, I know you're

6   trying to be helpful.  We're talking past each other.  So if I

7   ask a specific question you could answer it directly and that

8   will help me understand.

9          Mr. DeSousa says there was never any complaint about

10  Anselmo and racial slurs?

11         MR. CUOMO:  Again, and I --

12         THE COURT:  That's a yes or no.  It really is.

13         MR. CUOMO:  It's no in terms of I asked him the

14  question on the basis of the complaint.  In other words --

15         THE COURT:  Look, you practice how you practice.  I

16  can't imagine having a conversation with a client who's been

17  accused of these things and not going beyond a -- you know, an

18  affirmance or denial of a specific set of words.  I want to

19  know in part to inform the decision about can I ethically

20  represent all of them.

21         MR. CUOMO:  As far --

22         THE COURT:  Did you have a conversation with the

23  plaintiff -- any of the plaintiffs about Anselmo making racial

24  slurs?  That's the kind of conversation I --

25         MR. CUOMO:  Absolutely.  We went through that.

13

1          THE COURT:  And that never happened?

2          MR. CUOMO:  That never happened.

3          THE COURT:  Okay.

4          MR. CUOMO:  As far as -- and I went through each one

5     of the defendants and asked them about it and they said it

6     never occurred.

7          THE COURT:  Okay.

8          MR. CUOMO:  With respect to this particular

9     conversation that you're alleging in terms -- that -- you're

10    not alleging, but is being alleged in terms of that one of the

11    defendants, I believe went back to him and said something to

12    him when -- about issues in the field, with respect to racial

13    issues and what we had discussed then was he had never been

14    informed about racial issues as far as I know and as far as

15    I've discussed.

16         THE COURT:  So the plaintiffs never said anything to

17    your clients about racial slurs?

18         MR. CUOMO:  Correct.  And what we did --

19         THE COURT:  Okay.

20         MR. CUOMO:  -- and what I did do, we went through

21    the text just to refresh his recollection to see whether or

22    not there was any -- I had asked him were there any, you know,

23    text related to this and I had gone through it to see -- you

24    know, went through the phone system to see whether or not

25    there are any text complaining of this and we didn't see

1  anything there.  And then I had asked him directly, you know,

2  did this occur, did the conversation occur and he said,

3  "Look" -- he said to me something along the lines -- and I

4  don't want to testify now, but something along the lines "The

5  guys are always bitching about something in the field."  I

6  said, "Well, did this occur?" and he said, "As far -- no.  As

7  far -- I don't remember.  I don't remember this."

8          THE COURT:  Okay.  Separate issue.  Does the amended

9  complaint accurately quote a letter that one of you or one of

10  your colleagues sent to the plaintiffs' counsel?

11          MR. CUOMO:  No.

12          THE COURT:  No?

13          MR. CUOMO:  And that is a letter that was drafted by

14  the general manager.

15          THE COURT:  Okay.  I see.  But somebody on the

16  defendants' side -- does it accurately quote a letter from the

17  defendant?

18          MR. BARBARO:  It does, but it -- what's being quoted

19  here is that it wasn't a threat related to anything within the

20  complaint.  I believe the letter was that in the end or

21  something to that effect -- in the end when this is resolved

22  in our favor, we intend to sue the plaintiffs or whomever.  I

23  don't remember verbatim.  But I don't believe it was any

24  direct threat related to anything within the complaint or just

25  at the end of this when it's resolved in the company's favor

1  they intend to take action.

2          THE COURT:  You know, I have the quotation from it

3  in my notes and now I'm not finding it.  What -- do you

4  have --

5          MS. FORRESTER:  It's Paragraph 15.

6          THE COURT:  Thank you.  That's what I was ask for.

7  Okay.  And I take it you have the letter itself?

8          MS. FORRESTER:  Yes.

9          THE COURT:  Okay.

10          MS. FORRESTER:  Not with me.

11          THE COURT:  No, okay.

12          So MBI sent a letter -- it accurately quotes the

13  letter in Paragraph 15?

14          MR. CUOMO:  I do believe it does.

15          THE COURT:  Okay.  And MBI intends to file its own

16  actions to seek substantial damages against plaintiffs for

17  harm and financial burden inflicted upon MBI because of these

18  false allegations.  What lawsuit is available?  Is it based on

19  the complaint itself or something outside the complaint?

20          MR. CUOMO:  Again, I didn't write this letter --

21          THE COURT:  I'm not asking you if you wrote it, but

22  you represent --

23          MR. CUOMO:  I know --

24          THE COURT:  -- the entity that did.

25          MR. CUOMO:  I realize that and I never -- when I saw

16

1  the letter I was a little bit upset that anybody would do

2  that.  I didn't get into it with them, though, about it.  I

3  have no idea what this gentleman is intending on doing aft er

4  we're complete here.

5           THE COURT:  But it is a threat of retaliation for

6  bringing the lawsuit, isn't it?

7           MR. CUOMO:  I believe it's an affirmation that this

8  gentleman in the event he is successful intends to defend a

9  reputation of the company.

10          THE COURT:  It's not defensive --

11          MR. BARBARO:  And I would say, Your Honor --

12          THE COURT:  It's not defensive.  It is stating an

13  intention not to defend against an action, but to bring an

14  action.

15          MR. CUOMO:  Upon the successful conclusion --

16          MR. BARBARO:  Upon the successful conclusion --

17          MR. CUOMO:  -- of this action.

18          THE COURT:  Right.  And let's assume for purposes of

19  discussion that you successfully defend this action.  Is there

20  a lawsuit that can be brought that isn't completely foreclosed

21  by black letter law?

22          MR. CUOMO:  Again, I --

23          THE COURT:  You don't know?  You think that you can

24  sue somebody for bringing a lawsuit just because the lawsuit

25  isn't successful?

1          MR. CUOMO:  Well, I would imagine, Your Honor, that

2     if it turns out that these allegations are pulled out of whole

3     cloth and are simply lies or exaggerations and there is some

4     financial damage to the reputation of the company, again, I'm

5     not an attorney that handles these types of actions.

6          THE COURT:  But you are an attorney and you know

7     that this is privileged.  You can't sue somebody for filing a

8     lawsuit, can you?

9          MR. CUOMO:  Not necessarily, no.

10          THE COURT:  Okay.  Learning a lot today.

11          MR. BARBARO:  But, Your Honor, it was not an

12     attorney that wrote this, so I don't know --

13          THE COURT:  No, but attorneys are responding to my

14     questions in defending this conduct as not being retaliatory,

15     so that's what I'm learning about, the attorneys who think

16     that that's not retaliatory.  Okay.  I'm learning something

17     and I'm learning that you think it may be possible to sue the

18     plaintiffs because you're not saying it's not.  You're saying,

19     well, maybe in some circumstances.

20          MR. CUOMO:  Again, Your Honor, there are facts and

21     circumstances that we don't know what's gone on.  Whether or

22     not these statements were made outside the realm of -- and I'm

23     sure they were -- outside the realm of what are privileged

24     documents to third parties which would somehow give life to --

25          THE COURT:  And that's not what I was asking about.

1   I was careful about what I asked about and you were saying,

2   well, maybe.  Maybe you could sue them just for filing the

3   complaint.

4           MR. BARBARO:  Your Honor, if I may, let me say this

5   directly.  Okay.  Let me answer the question directly and --

6           THE COURT:  That would be useful.

7           MR. BARBARO:  Do I think that there is an action to

8   be brought if in -- in this case is found -- is dismissed or

9   found to be a false or fraudulent case?  Yes.  I think there

10  could be a malicious prosecution claim.  I think there could

11  be a liable claim.  I think there could be other claims.

12          THE COURT:  There could be held liable for filing a

13  lawsuit?  My goodness.  Okay.

14          MR. BARBARO:  If you filed the lawsuit, Your Honor,

15  with bad intentions, with the intention --

16          THE COURT:  Oh, okay.

17          MR. BARBARO:  -- of liable-ing [ph.] somebody, I

18  believe the you can --

19          THE COURT:  All right.  All right.

20          MR. BARBARO:  -- file it under state law.

21          THE COURT:  All right.  Okay.  Well, like I say, I'm

22  learning something today.  Okay.  Let's talk about discovery.

23  Are there any discovery issues that you anticipate that are

24  going to be in dispute?

25          MR. BARBARO:  I think we are trying to work out the

1   issue of the payroll.  Of course, you know, obviously the

2   payroll involves a whole bunch of people that are not parties

3   to this -- to this action, but by the same token I see that

4   counsel needs this for use in her -- preparation of her case.

5   We're trying to work out a method that can ensure the

6   anonymity of the other employees who are not part of this

7   action and give her the information that she wants.  So we

8   just have to figure out the period and just a way of

9   protecting the identity of the --

10          THE COURT:  All right.  But there's no dispute.

11  That's what I'm trying to find out --

12          MR. BARBARO:  No, right now --

13          THE COURT:  -- because if there is, we can plan for

14  it.

15          MR. BARBARO:  -- no --

16          THE COURT:  Okay.

17          MR. BARBARO:  -- no dispute on that.

18          THE COURT:  All right.  On your discovery schedule I

19  didn't quite understand it.  First of all, what kind of

20  experts -- you mentioned treatment and you'll get that, but

21  you have non-medical experts?

22          MS. FORRESTER:  Yes.  So an HR professional that

23  talks about best practices.

24          THE COURT:  For what?  I mean, this is --

25          MS. FORRESTER:  For their pol -- like the policies

1  that -- investigatory policies that a company should have in
2  place and the policies that they did not have in place.
3          THE COURT:  But is that a relevant issue or is it
4  just a matter of whether they were acting in a discriminatory
5  fashion?
6          MS. FORRESTER:  Well, in the --
7          THE COURT:  In the -- yeah, they could have good or
8  bad HR policies and that wouldn't tell you anything about
9  whether -- whether they were acting in a discriminatory
10  manner, right?
11          MS. FORRESTER:  Yeah.  I guess if they had a policy
12  and they weren't following it.
13          THE COURT:  Yeah.
14          MS. FORRESTER:  Yeah.
15          THE COURT:  It would depend on why.
16          MS. FORRESTER:  Um-hum.
17          THE COURT:  Right.  Again, it might be completely
18  innocuous reasons or discriminatory reasons, but I really --
19          MS. FORRESTER:  We're willing to go through the --
20          THE COURT:  I'm not saying you should go without.
21  I'm just trying to understand that and I still don't, but I am
22  not making at all any ruling on what you can and can't do.  I
23  was just trying to understand what you have.
24          But the more pressing question I have is about the
25  schedule.  You have your expert reports to be completed by the

1  end of May, fact discovery goes on for a couple of months

2  after that.  And I'm sorry, not your -- both sets of experts

3  are due the same day at the end of May and then discovery goes

4  on beyond that.  Tell me what you think.  Typically I see the

5  parties proposing fact discovery and then a -- you know, a

6  little time on each side for responsive experts.  Do you have

7  anything else in mind or what -- just tell me what you're

8  thinking so I understand it.

9        MS. FORRESTER:  So I was actually -- and I'm sure

10  about this and we -- we met about it and I believe that

11  opposing counsel was thinking that after fact discovery ended

12  they would then want addition -- like from that they would

13  then speak with the experts.

14        THE COURT:  But their expert report under this

15  proposal is due on May 30th.  That's what I don't understand.

16  And yours is due on May 30th also.  Is that just an

17  inadvertent error or is it something you guys have planned?

18        MS. FORRESTER:  I believe that this may be an error

19  but I'm not sure.

20        THE COURT:  But is the idea that -- on both sides

21  that you want to get the facts under your belt and then turn

22  them over to an expert?

23        MR. BARBARO:  That's correct.

24        THE COURT:  Okay.  So would it make more sense then

25  to say six months to complete fact discovery and a month after

1    that so experts on the plaintiff side and then a month after

2    that for reports from the defendants' expert?

3              MR. BARBARO:  That would be great, Your Honor.

4              THE COURT:  Okay.  Does that make sense to you at

5    all?

6              MS. FORRESTER:  Yes, that makes sense.

7              THE COURT:  Okay.  Okay.  So I'll do that.  And in

8    turn I say that you had a date to complete expert discovery

9    beyond other discovery.  If that's just expert depositions,

10   which I often say my standard order has expert depositions

11   that can take place anytime before trial, point is to close

12   discovery with the exchange of the reports so that you have a

13   record on which to move for summary judgment if anyone is

14   going to do that.

15             All right.  You've mentioned settlement a couple of

16   times.  Have you had any discussions about that yet?

17             MS. FORRESTER:  No, we haven't had any significant

18   discussions.

19             THE COURT:  Okay.  I get the impression from the

20   tenor of the conversation so far on both sides that it's

21   unlikely to be useful to have settlement discussions now, but

22   I'm open to it.  I'm happy to host a settlement conference or

23   refer you to mediation if you all think that would be useful.

24             MR. CUOMO:  Right now we're not in that happy place,

25   Your Honor.

1          MS. FORRESTER:  I think mediation would be useful,

2     but we have to -- I've suggested it and it seems as if it's --

3     their -- their clients are taking just like a no-settlement-

4     discussion position.

5          THE COURT:  Okay.  Well, that may change over time

6     depending on how the facts play out.  So I'm not going to

7     force the issue, but I welcome you to let me know when a

8     referral to mediation or settlement conference with me would

9     be useful.

10          MR. BARBARO:  Your Honor would host a settlement

11    conference?

12          THE COURT:  If that's what you all want.

13    Absolutely.  Is that something you're interested in now or you

14    want to get some discovery done?

15          MR. CUOMO:  No, we would have -- we would have to

16    go -- I would suggest going through some discovery -- going

17    through discovery and then readdressing the issue later on.

18          THE COURT:  Okay.  All right.  Well --

19          MR. CUOMO:  I think it would be most helpful.

20          THE COURT:  Okay.  So -- and can I have a date in

21    early May, please?

22          MS. FORRESTER:  There's one discovery issue that

23    came up -- came to my mind when the defendants were making

24    their response --

25          THE COURT:  Yes, go ahead.

1         MS. FORRESTER:  -- if I could just bring it up.  So

2   in this case we need to be able to have comparators and

3   opposing counsel brought up the other employees remaining

4   anonymous, so that will be -- it will be difficult to identify

5   non-black comparators if the other employees are to remain

6   anonymous.

7         THE COURT:  All right.  Well, comparators for what

8   and I read --

9         MS. FORRESTER:  There's --

10        THE COURT:  Go ahead.

11        MS. FORRESTER:  So one of the causes of action is

12  that my clients who are all black were being paid less than --

13        THE COURT:  I see.

14        MS. FORRESTER:  -- their non-black counterparts,

15  even --

16        THE COURT:  Okay.  So you --

17        MS. FORRESTER:  -- certified welders were being

18  paid --

19        THE COURT:  -- want -- yeah, got it.

20        MS. FORRESTER:  -- less than the non-black certified

21  welders.  So if --

22        THE COURT:  They want pay comparisons.

23        MS. FORRESTER:  They will need pay comparisons and

24  also we would need to know who the person is so we would

25  know --

1          THE COURT:  All right.  Well, I'm sure you can work
2     out a confidentiality order to --
3          MS. FORRESTER:  Yes, I'm sure we could, too.  I just
4     am --
5          THE COURT:  You're not proposing to keep that
6     information from disclosure, are you?
7          MR. BARBARO:  As far as we have it, we'll provide
8     it.
9          THE COURT:  Okay.  But I wasn't sure if you were
10    saying you'd provide it anonymously or with names attached.
11         MR. BARBARO:  Well, my first reaction was to provide
12    a payroll sheet that says -- you know, basically omits the
13    name and --
14         THE COURT:  Okay.  So you did want to do it
15    anonymously.
16         MR. BARBARO:  You know --
17         THE COURT:  Okay.
18         MR. BARBARO:  -- someone.  But in terms of ethnicity
19    on the various employees -- how many employees do we have?
20         MR. CUOMO:  Currently?
21         MR. BARBARO:  Yeah.
22         MR. CUOMO:  I'm not -- I think it's 35, 40.
23         MR. BARBARO:  Okay.  So we'll --
24         MR. CUOMO:  It's not an unmanageable number.
25         MR. BARBARO:  Yeah.  And --

1          MR. CUOMO:  But we're talking about, you know, past

2    employees as well.

3          MR. BARBARO:  I --

4          MR. CUOMO:  So we can only -- you know, there's a

5    question of how you identify and --

6          MR. CUOMO:  By name, I think.

7          MR. CUOMO:  No, I mean, but whether somebody

8    identifies as black or Caribbean or some other ethnicity.  I

9    can only, you know, say how -- just give her a rough thing,

10   you know.

11         MR. BARBARO:  I'm sure we'll work it out, but I

12   think the first step is to --

13         THE COURT:  To the extent you want to have a

14   confidentiality order to protect against disclosure --

15         MR. BARBARO:  Sure.

16         THE COURT:  -- publicly information that shouldn't

17   be, that's fine.  But in terms of sharing information among

18   yourselves, I think you avoid a lot of problems.  I'm not

19   ruling on anything --

20         MR. BARBARO:  No.

21         THE COURT:  -- at this point, but I think we avoid a

22   lot of problems and don't take on unnecessary problems by

23   having the names disclosed --

24         MR. BARBARO:  Yeah.

25         THE COURT:  -- and to the extent that you can find a

1  way to convey anything that's not in the record, I'm sure

2  plaintiffs will know many of these folks, in any event.  And

3  employers often have race ethnicity information as part of

4  their records.  But anyway, you'll see what you have.

5          MR. BARBARO:  I don't know.  And like I said, this

6  is relatively small.

7          THE COURT:  Yeah.  Okay.

8          MR. BARBARO:  You know, the HR department is --

9          THE COURT:  You'll work it out and if you can't,

10  you'll bring up a motion to me.

11          Okay.  So I need a date for a status conference,

12  please.

13          THE CLERK:  Judge, it can be May 4th at 10 o'clock.

14          THE COURT:  Okay.  All right.  So see you then,

15  first status conference.  If everything is on track and you

16  don't have any disputes or still too early to talk settlement,

17  let me know and I can adjourn it and unless anyone has

18  anything else, I'll let you go.

19          MS. FORRESTER:  Nothing else, thank you.

20          THE COURT:  Thank you all.  Have a good day.

21          MR. BARBARO:  Thank you, Your Honor.

22  (Proceedings concluded at 11:35 a.m.)

23                    *  *  *  *  *  *  *

24

25

28

1        I certify that the foregoing is a court transcript

2   from an electronic sound recording of the proceedings in the

3   above-entitled matter.

4

5

6   _____

7   Ruth Ann Hager, C.E.T.**D-641

8   Dated:   January 31, 2020

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25